DAVID SEROR – Bar No. 67488
JESSICA L. BAGDANOV – Bar No. 281020
BRUTZKUS GUBNER
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Email      dseror@bg.law
            jbagdanov@bg.law

Attorneys for ABC Services Group, Inc.,
Assignee for the Benefit of Creditors of
Len Co, LLC, Alleged Debtor

JEFFREY E. BJORK – Bar No. 197930
ADAM E. MALATESTA – Bar No. 274449
HELENA G. TSEREGOUNIS – Bar No. 287422
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email      jeff.bjork@lw.com
            adam.malatesta@lw.com
            helena.tseregounis@lw.com

Attorneys for Len Co, LLC, Alleged Debtor

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| In re: | Case No. 18-52484 |
| LEN CO, LLC, | **MOTION TO (I) DISMISS THE INVOLUNTARY PETITION AGAINST LEN CO, LLC AND (II) IMPOSE ATTORNEYS' FEES, COSTS, AND DAMAGES ACCORDING TO PROOF OR, ALTERNATIVELY, ORDERING PETITIONING CREDITOR TO POST A BOND; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| Alleged Debtor. | |
| | Date: January 9, 2019 |
| | Time: 10:00 a.m. |
| | Place: Courtroom 3020 |
| | 280 South First Street |
| | San Jose, California 95113-3099 |

# **TABLE OF CONTENTS**

**Page**

I.     JURISDICTION AND VENUE ..................................................................................2

II.    STANDING ..............................................................................................................2

III.   RELEVANT FACTUAL BACKGROUND................................................................2

     A.    AM Ventures LLC .........................................................................................2

     B.    Investment in Knight Capital .........................................................................3

     C.    Dispute Between Mr. Perelman and Ms. Machulskaya..................................4

     D.    Assignment for the Benefit of Creditors .......................................................5

IV.   THE INVOLUNTARY PETITION SHOULD BE DISMISSED UNDER
     BANKRUPTCY CODE SECTION 305(A) BECAUSE A CHAPTER 7
     PROCEEDING IS NOT IN THE BEST INTERESTS OF CREDITORS AND THE
     ALLEGED DEBTOR ...............................................................................................6

     A.    Len Co's Assets Should Be Administered in the Pending Assignment.........7

          1.    Relative Costs of the Assignment and a Chapter 7 Proceeding......................11

V.    THE INVOLUNTARY PETITION SHOULD BE DISMISSED UNDER
     BANKRUPTCY CODE SECTIONS 105(A) AND 303 BECAUSE IT WAS FILED
     BY STM IN BAD FAITH .......................................................................................13

VI.   THE MOVANTS ARE ENTITLED TO ATTORNEYS' FEES, COSTS, AND
     DAMAGES..............................................................................................................17

VII.  IF THE INVOLUNTARY PETITION IS NOT IMMEDIATELY DISMISSED, STM
     SHOULD BE REQUIRED TO POST A BOND.....................................................18

VIII. CONCLUSION.......................................................................................................18

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re 801 South Wells St. Ltd. P'ship*,
192 B.R. 718 (Bankr. N.D. Ill. 1996) ...................................................................10, 11

*In re A & B Liquidating, Inc.*,
18 B.R. 922 (Bankr. E.D. Va. 1982)..........................................................................2

*In re Artists' Outlet, Inc.*,
25 B.R. 231 (Bankr. D. Mass. 1982) ........................................................................13

*In re AXL Indus., Inc.*,
127 B.R. 482 (S.D. Fla. 1991) ..................................................................................10

*In re Bailey's Beauticians Supply Co.*,
671 F.2d 1063 (7th Cir. 1982) ...............................................................................8, 9

*Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.*,
131 Cal. 4th 802 (2005) ............................................................................................7

*In re Bicoastal Holding Co.*,
402 B.R. 916 (Bankr. M.D. Fla. 2009) .....................................................................14

*Brainard v. Fitzgerald*,
3 Cal. 2d 157 (1935) ..................................................................................................7

*In re Caucus Distribs., Inc.*,
106 B.R. 890 (Bankr. E.D. Va. 1989)........................................................................15

*In re Cincinnati Gear Co.*,
304 B.R. 784 (Bankr. S.D. Ohio 2003)....................................................................7, 8

*In re Colonial Ford, Inc.*,
24 B.R. 1014 (Bankr. D. Utah 1982) .........................................................................6

*Efron v. Candelario (In re Efron)*,
529 B.R. 396 (B.A.P. 1st Cir. 2015) .........................................................................10

*In re Express Car Truck & Rental, Inc.*,
440 B.R. 422 (Bankr. E.D. Pa. 2010) .......................................................................17

*In re Forever Green Athletic Fields, Inc.*,
804 F.3d 328 (3d Cir. 2015).................................................................13, 14, 15, 17

ii

*Graham v. Yoder Mach. Sales (In re Weldon F. Stump & Co.)*,
    373 B.R. 823 (Bankr. N.D. Ohio 2007) ...............................................................6

*In re Grecian Heights Owners' Ass'n*,
    27 B.R. 172 (Bankr. D. Or. 1982) ......................................................................15

*In re Grossinger*,
    268 B.R. 386 (Bankr. S.D.N.Y. 2001) ..............................................................16

*Haberbush v. Cummins*,
    139 Cal. App. 4th 1630 (2006) ...........................................................................8

*Higgins v. Vortex Fishing Systems, Inc.*,
    379 F.3d 701 (9th Cir. 2004) .............................................................................17

*Jaffe v. Wavelength, Inc. (In re Wavelength, Inc.)*,
    61 B.R. 614 (B.A.P. 9th Cir. 1986) .............................................................15, 17

*Lucre Mgmt. Grp., LLC v. Schempp Real Estate, LLC (In re Schempp Real Estate, LLC)*,
    303 B.R. 866 (Bankr. D. Colo. 2003) ...............................................................11

*In re M. Egan Co.*,
    24 B.R. 189 (Bankr. W.D.N.Y. 1982) .......................................................6, 9, 13

*Marciano v. Chapnick (In re Marciano)*,
    708 F.3d 1123 (9th Cir. 2013) ...........................................................................14

*Marciano v. Fahs (In re Marciano)*,
    459 B.R. 27 (B.A.P. 9th Cir. 2011) ...................................................................14

*In re Meltzer*,
    516 B.R. 504 (Bankr. N.D. Ill. 2014) ...............................................................17

*In re Mi La Sul*,
    380 B.R. 546 (Bankr. C.D. Cal. 2007) ..............................................................15

*In re Michael S. Starbuck, Inc.*,
    14 B.R. 134 (Bankr. S.D.N.Y. 1981) ...............................................................10

*Middel v. Jake's on the Pike (In re Jake's on the Pike)*,
    78 B.R. 461 (Bankr. E.D. Va. 1987) .................................................................14

*In re Mineral Hill Corp.*,
    16 B.R. 687 (Bankr. D. Md. 1982) .....................................................................9

*In re NNN Realty Advisors, Inc.*,
    No. 15-30508-BKC-RBR, 2016 Bankr. LEXIS 1777 (Bankr. S.D. Fla. Apr. 15,
    2016) ..........................................................................................................9, 10, 13

iii

*In re Pine Lake Vill. Apartment Co.*,
   16 B.R. 750 (Bankr. S.D.N.Y. 1982) ................................................................6

*Pobreslo v. Joseph M. Boyd Co.*,
   287 U.S. 518 (1933) ..........................................................................................8

*ProFutures Special Equity Fund, L.P. v. Spade (In re Spade)*,
   269 B.R. 225 (D. Colo. 2001) .....................................................................7, 16

*Prometheus Health Imaging, Inc. v. UST - United States Tr. (In re Prometheus Health Imaging, Inc.)*,
   705 F. App'x 626 (9th Cir. 2017) .................................................................14

*In re Runaway II, Inc.*,
   168 B.R. 193 (Bankr. W.D. Mo. 1994) ..........................................................10

*Sherwood Partners, Inc. vs. Lycos, Inc.*,
   394 F.3d 1198 (9th Cir. 2005) .........................................................................8

*In re Short Hills Caterers, Inc.*,
   No. 08-18604 (DHS), 2008 Bankr. LEXIS 1726 (Bankr. D.N.J. June 4, 2008) ...........................9

*In re Silberkraus*,
   253 B.R. 890 (Bankr. C.D. Cal. 2000), *aff'd*, 336 F.3d 864 (9th Cir. 2003) ................................16

*In re Southern Calif. Sunbelt Developers, Inc.*,
   608 F.3d 456 (9th Cir. 2010) .........................................................................17

*In re Spade*,
   258 B.R. 221 (Bankr. D. Colo. 2001) ...........................................................13

*In re United States Optical, Inc.*,
   No. 92-1496, 1993 U.S. App. LEXIS 6960 (4th Cir. Apr. 1, 1993) ...........................14

*Wechsler v. Macke Int'l Trade, Inc. (In re Macke Int'l Trade, Inc.)*,
   370 B.R. 236 (B.A.P. 9th Cir. 2007) .................................................... *passim*

*In re Westerleigh Dev. Corp.*,
   141 B.R. 38 (Bankr. S.D.N.Y. 1992) ..............................................................11

*In re Williamsburg Suites, Ltd.*,
   117 B.R. 216 (Bankr. E.D. Va. 1990) .............................................................10

*In re WLB-RSK Venture*,
   296 B.R. 509 (Bankr. C.D. Cal. 2003) .......................................................14, 16

**STATUTES**

11 U.S.C. § 105(a) ...................................................................................1, 14

11 U.S.C. § 303 ...........................................................................1, 13, 14, 17

iv

11 U.S.C. § 303(i) .................................................................................................. 1, 17, 18

11 U.S.C. § 303(i)(2) ................................................................................................... 14, 17

11 U.S.C. § 303(d) ............................................................................................................... 2

11 U.S.C. § 303(e) ......................................................................................................... 1, 18

11 U.S.C. § 305 ................................................................................................................... 9

11 U.S.C. § 305(a) .................................................................................................. 6, 10, 13

11 U.S.C. § 305(a)(1) .................................................................................................. *passim*

11 U.S.C. § 326(a) ............................................................................................................. 12

11 U.S.C. § 1112(b)(1) ..................................................................................................... 14

28 U.S.C. § 157 ................................................................................................................... 2

28 U.S.C. § 157(b) .............................................................................................................. 2

28 U.S.C. § 1334(b) ............................................................................................................ 2

28 U.S.C. § 1408 ................................................................................................................. 2

28 U.S.C. § 1409 ................................................................................................................. 2

Cal. Civ. Code § 3439 *et seq* ............................................................................................. 8

Cal. Code Civ. Proc. § 493.010, *et seq* .............................................................................. 8

Cal. Code Civ. Proc. § 493.020 .......................................................................................... 8

Cal. Code Civ. Proc. § 1800, *et seq* ............................................................................... 7, 8

## RULES

Fed. R. Bankr. P. 1011(a) .................................................................................................. 2

Fed. R. Bankr. P. 1011(b) .................................................................................................. 1

## CONSTITUTIONAL PROVISIONS

U.S. Const., art. III ............................................................................................................. 2

## OTHER AUTHORITIES

Collier on Bankruptcy ¶ 305.02 (Richard Levin & Henry J. Sommer eds., 16th ed.) ............ 11, 14, 17

H.R. Rep. No. 95-595. 95th Cong., 1st Sess. 325 (1977) .................................................. 7

v

Mike C. Buckley & Gregory Sterling, *What Banks Need to Know About ABCs*, 120
    Banking L.J. 48, 54 (2003) ....................................................................................................8

S. Rep. 95-989, 95th Cong., 2nd Sess. 35 (1978) ..............................................................7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TO THE HONORABLE M. ELAINE HAMMOND, UNITED STATES BANKRUPTCY JUDGE, PETITIONING CREDITOR STM HOLDINGS S.A.R.L., AND OTHER INTERESTED PARTIES:**

Len Co, LLC, a Delaware limited liability company and the alleged debtor ("Len Co"), and ABC Services Group, Inc., a Delaware corporation and the assignee for the benefit of creditors of Len Co ("Assignee" and, together with Len Co, the "Movants"), hereby jointly move to dismiss the involuntary petition filed by petitioning creditor STM Holdings, S.a.r.l. ("STM") against Len Co (the "Involuntary Petition") pursuant to (i) Section 305(a)(1) of Title 11 of the United States Code (the "Bankruptcy Code") or (ii) alternatively, Bankruptcy Code Sections 105(a) and 303. The Movants further request that the Court award the Movants their reasonable attorneys' fees and costs, as well as damages, for having to respond to the Involuntary Petition pursuant to Bankruptcy Code Section 303(i), or, alternatively, require STM to post a bond in an amount not less than $500,000, pursuant to Bankruptcy Code Section 303(e).

Cause for dismissal of the Involuntary Petition exists because Len Co's assets are the subject of an assignment for the benefit of creditors under California law (the "Assignment"), which is substantively underway for the benefit of Len Co's creditors. In light of the pending Assignment, there is no proper bankruptcy purpose that could be accomplished by way of the Involuntary Petition, which appears to have been filed in an attempt by STM's owner to gain leverage in an unrelated dispute with Len Co's sole member. As a result, the Involuntary Petition should be dismissed, and STM should bear the costs of this improper filing.

The Motion is brought pursuant to Rule 1011(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and is supported by these moving papers, the declaration of Leonid Perelman in support of the Motion filed concurrently herewith, the declaration of Charles Klaus in support of the Motion filed concurrently herewith (the "Klaus Declaration"), the record of the above-captioned case, and any oral or documentary evidence submitted at or prior to the hearing on the Motion.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    JURISDICTION AND VENUE

The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Movants consent to the entry of a final order by the Court in connection with this application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

## II.    STANDING

Movants in this matter are (i) Len Co (*i.e.*, the alleged debtor) and (ii) the Assignee.  Len Co has standing to bring this Motion under Bankruptcy Code Section 303(d) and Bankruptcy Rule 1101(a).  *See* 11 U.S.C. § 303(d) ("The debtor, or a general partner in a partnership debtor that did not join in the petition, may file an answer to a petition under this section."); Fed. R. Bankr. P. 1011(a) ("The debtor named in an involuntary petition may contest the petition.").  The Assignee, although not the alleged debtor, nonetheless has standing to file a responsive pleading to the Involuntary Petition.  *See In re A & B Liquidating, Inc*., 18 B.R. 922 (Bankr. E.D. Va. 1982) (holding that an assignee for the benefit of creditors has standing to file an answer to involuntary bankruptcy proceeding and, even if assignee has no standing, is entitled to intervene).  The Assignee's right to respond to the Involuntary Petition is consistent with the policies supporting the use of assignments for the benefit of creditors.

## III.    RELEVANT FACTUAL BACKGROUND[1]

### A.    AM Ventures LLC

In 2012, Mr. Leonid Perelman and Mr. Anatoly Machulskiy, who had been close friends for nearly four decades, organized AM Ventures LLC, a Delaware limited liability company ("AMV"), to serve as the vehicle through which Mr. Perelman would invest and manage capital provided by

---

[1]    For purposes of judicial economy, the Movants agreed to jointly file one motion to dismiss the Involuntary Petition.  However, Mr. Klaus and the Assignee do not have personal knowledge regarding the facts contained in sections III.A through C, and thus do not take a position with regard to those issues.

2

Mr. Machulskiy. Mr. Perelman and Mr. Machulskiy agreed that Mr. Machulskiy would receive an eight percent (8%) per annum, non-compounding preferred return on invested capital with respect to each investment, with any return in excess thereof to be divided evenly between Mr. Perelman and Mr. Machulskiy.[2][3] The portion of returns to which Mr. Perelman is entitled is the primary remuneration for his investment and management of Mr. Machulskiy's capital.

In 2014, after being diagnosed with terminal cancer, Mr. Machulskiy transferred his interest in AMV to his daughter, Ms. Sofiya Machulskaya, whom Movants understand to be STM's sole beneficial owner.

## B. Investment in Knight Capital

In 2014, Mr. Perelman was presented with the opportunity to make a debt investment in Knight Capital LLC, a Delaware limited liability company ("Knight Parent"), and certain of its subsidiaries (collectively, together with Knight Parent, "Knight Capital"). In the course of evaluating and structuring such investment, Mr. Perelman was advised that Ms. Machulskaya's equity ownership in AMV could cause her to incur material incremental tax liability if such investment were made through AMV and its subsidiaries. Thus, solely as an accommodation to minimize Ms. Machulskaya's prospective tax obligations, the investment in Knight Capital was made outside of the organizational structure consisting of AMV and its subsidiaries (the "AMV Structure").[4] Instead of making the debt investment through the AMV Structure, Mr. Perelman organized Len Co as a single member limited liability company and caused it to issue to STM a promissory note with a thirteen percent (13%) per annum interest rate (the "Promissory Note"). Concurrently therewith, Len Co entered into a credit facility with Knight Capital (the "Knight Credit Facility"), pursuant to which Knight Capital agreed to pay Len Co interest at a rate of eighteen

---

[2] The description of the arrangement between the parties has been simplified for purposes of this Motion, as each of the parties holds its interest in AMV indirectly through various entities.

[3] As an example, if an investment returned twenty percent (20%), Mr. Machulskiy would receive the first eight percent (8%) and Mr. Machulskiy and Mr. Perelman would split the remaining twelve percent (12%) evenly, such that Mr. Machulskiy would receive a total return of fourteen percent (14%) and Mr. Perelman would receive a total return of six percent (6%).

[4] In 2016, an additional $20 million equity investment was made in Knight Capital through an affiliate of AMV, which affiliate currently holds 51% of the common equity in Knight Parent and $15 million of preferred equity in Knight Parent.

3

percent (18%) per annum.

This "back-to-back" loan structure (the "Alternative Structure"), whereby STM loaned funds to Len Co at a thirteen percent (13%) per annum interest rate and Len Co loaned those funds to Knight Capital at an eighteen percent (18%) per annum interest rate, was designed to achieve the same division of returns between Ms. Machulskaya and Mr. Perelman as would have resulted from an investment made through the AMV Structure.[5] Under the Alternative Structure, if the amounts owed under the Knight Credit Facility were paid in full, Len Co would collect eighteen percent (18%) interest on the amount of the loan and pay STM thirteen percent (13%) interest on the same amount, with the five percent (5%) difference retained by Len Co. By way of comparison, an investment yielding an eighteen percent (18%) return under the AMV Structure would be allocated as follows: Ms. Machulskaya would receive the first eight percent (8%) and the remaining ten percent (10%) would be evenly divided, such that Ms. Machulskaya would receive a total return of thirteen percent (13%) and Mr. Perelman would receive a return of five percent (5%).[6]

In late 2017 and early 2018, in connection with a series of refinancing agreements entered into by Knight Capital with two third party lenders, $20 million in outstanding principal under the Knight Credit Facility was converted into $20 million in preferred equity in Knight Parent (the "Knight Class A Units"), and the maturity date of the remaining obligations under the Knight Credit Facility was extended until at least July 2021.[7][8]

## C. Dispute Between Mr. Perelman and Ms. Machulskaya

Although Mr. Perelman had managed the capital provided by Mr. Machulskiy for more than five years without any indication of discord, in February 2018, Ms. Machulskaya contacted Mr.

---

[5] The Alternative Structure was shared with Ms. Machulskaya in writing prior to its implementation.

[6] Payments to Ms. Machulskaya and Mr. Perelman under the AMV Structure are made to entities controlled by, rather than directly to, Ms. Machulskaya and Mr. Perelman.

[7] The maturity date under the Knight Credit Facility is thirty days after the maturity date under the credit agreement entered into by Knight Capital with the third party lender (the "Third Party Credit Agreement"). In the event the maturity date under the Third Party Credit Agreement is extended, the maturity date under the Knight Credit Facility will be automatically extended to thirty days following the amended maturity date under the Third Party Credit Agreement.

[8] Although the maturity dates of the Promissory Note and the Knight Credit Facility were initially aligned, and although Mr. Perelman expected that the maturity date of the Promissory Note would be similarly extended, the maturity date of the Promissory Note was never formally extended.

4

Perelman and, for the first time, expressed her dissatisfaction with the terms of the deal entered into by Mr. Machulskiy and Mr. Perelman (the "Deal Terms"). Since that time, in order to gain leverage in an attempt to renegotiate the Deal Terms, Ms. Machulskaya and her counsel have repeatedly threatened litigation against Mr. Perelman, his family members and his business associates, and have demanded an extensive investigation into AMV and its affiliates and the investments made by those entities. In an attempt to amicably resolve what unexpectedly became a strained relationship with Ms. Machulskaya, Mr. Perelman has gone to great lengths to be forthcoming and accommodating by providing Ms. Machulskaya with the information she has requested. Mr. Perelman and his employees have spent a significant amount of time answering detailed questions, responding to voluminous document requests, and producing bespoke reports, all at the opportunity cost of devoting time to managing their existing investment portfolio. Since the outset of the dispute regarding the Deal Terms (the "AMV Dispute"), Ms. Machulskaya has made it evident that she will not relent until the Deal Terms, which were entered into in an arm's-length transaction between Mr. Perelman and her father, are retrospectively amended, and Mr. Perelman is simply unwilling to renegotiate such Deal Terms (because, among other reasons, the fundamental investment strategy of the AMV Structure was dictated by such terms).

### D. Assignment for the Benefit of Creditors

In April 2018, with the parties engaged in the AMV Dispute, the amounts outstanding under the Promissory Note came due. Sensing that Mr. Perelman was unwilling to renegotiate the Deal Terms, and, in an attempt to gain leverage in the broader AMV Dispute, Ms. Machulskaya sought to weaponize the Alternative Structure, which had been implemented solely for her benefit, by causing STM to issue a demand for payment to Mr. Perelman on or about July 23, 2018. After weeks of discussions, which included a proposal by Mr. Perelman for a new promissory note with revised terms,[9] the parties remained at an impasse, and Mr. Perelman determined that it was best to introduce a third party fiduciary. As a result, on September 26, 2018, Len Co executed a General

---

[9] One such revised term provided that in the event that Len Co had sufficient available funds such that it could distribute in excess of thirteen percent (13%) per annum to STM, such excess amounts would be paid to STM rather than being retained by Len Co.

5

Assignment for the Benefit of Creditors (the "Assignment Agreement"), a copy of which is attached to the Klaus Declaration as Exhibit 1, and assigned its assets to the Assignee.

Mr. Charles Klaus, the President of the Assignee, will administer Len Co's assets in order to maximize their value. Over the past two months, Mr. Klaus, who has acted as assignee on well over 200 assignments during his 38-year career, has conducted extensive diligence on Len Co and its assets. Mr. Klaus has also retained a financial advisor to assist with the monetization of the Len Co assets in a manner that maximizes their value. Notwithstanding the foregoing, on November 6, 2018, STM filed the Involuntary Petition against Len Co, to which the Movants hereby respond.

## IV. THE INVOLUNTARY PETITION SHOULD BE DISMISSED UNDER BANKRUPTCY CODE SECTION 305(A) BECAUSE A CHAPTER 7 PROCEEDING IS NOT IN THE BEST INTERESTS OF CREDITORS AND THE ALLEGED DEBTOR

Bankruptcy Code Section 305(a)(1) allows the Court to dismiss a bankruptcy case if "the interests of creditors and the debtor would be better served by such dismissal." 11 U.S.C. § 305(a)(1). In this case, the Movants respectfully submit that creditors of the assignment estate and the alleged debtor do not stand to receive any benefit by STM's invocation of this Court's jurisdiction.

While "Congress intended the court to exercise considerable discretion in sifting and weighing grounds for dismissal under Section 305(a)(1)," *In re Colonial Ford, Inc.*, 24 B.R. 1014, 1021 (Bankr. D. Utah 1982), the Court applies that discretion against the backdrop of the "prime congressional policy underlying the abstention doctrine of § 305(a)," which "is to prevent the commencement and continuation of disruptive involuntary cases." *Graham v. Yoder Mach. Sales (In re Weldon F. Stump & Co.),* 373 B.R. 823, 828 (Bankr. N.D. Ohio 2007); *see also Wechsler v. Macke Int'l Trade, Inc. (In re Macke Int'l Trade, Inc.),* 370 B.R. 236, 246 (B.A.P. 9th Cir. 2007); *In re M. Egan Co.*, 24 B.R. 189, 191 (Bankr. W.D.N.Y. 1982) ("One court has emphasized the guideline that abstention is most appropriate in an involuntary case.") (citing *In re Pine Lake Vill. Apartment Co.*, 16 B.R. 750, 753 (Bankr. S.D.N.Y. 1982)). Indeed, the legislative history to Bankruptcy Code Section 305(a) provides, in part, that:

6

> This section recognizes that there are cases in which it would be appropriate for the court to decline jurisdiction . . . . Thus, the court is permitted, if the interests of creditors and the debtor would be better served by dismissal of the case or suspension of all proceedings in the case, to so order. **The court may dismiss or suspend under the first paragraph, for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case.**

*See* H.R. Rep. No. 95-595. 95th Cong., 1st Sess. 325 (1977); S. Rep. 95-989, 95th Cong., 2nd Sess. 35 (1978) (emphasis added); *see also In re Cincinnati Gear Co.*, 304 B.R. 784, 785 (Bankr. S.D. Ohio 2003) (citing the legislative history and noting that "Congress appears to have contemplated the use of this extreme remedy particularly in involuntary cases like this where an alternative arrangement exists for the protection of creditors").

"The analysis as to whether the interests of creditors and the debtor would be better served by such dismissal is based on the totality of the circumstances." *Macke Int'l Trade*, 370 B.R. at 247; *see also ProFutures Special Equity Fund, L.P. v. Spade (In re Spade)*, 269 B.R. 225, 228 (D. Colo. 2001) ("[A] bankruptcy court is not bound by a prescriptive template; it may consider any factors it deems relevant to the determination of whether it is in the best interests of the parties to the suit to seek dismissal.").

### A.    Len Co's Assets Should Be Administered in the Pending Assignment

In an assignment for the benefit of creditors, or an "ABC," the assignee is analogous to a Chapter 7 trustee, who acts as a fiduciary to the assignor's creditors and is responsible for the orderly administration of the estate and the payment of claims. *See Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.*, 131 Cal. 4th 802, 829 (2005). Such assignment is a contract (in this case, made at arm's-length, between two unrelated parties), whereby the assignor transfers legal and equitable title, as well as custody and control of its property, to a third party assignee in trust, for the purpose of applying the proceeds to payment of the assignor's creditors and, to the extent of any residual, to its shareholders. *See Brainard v. Fitzgerald*, 3 Cal. 2d 157, 162-163 (1935).

In California, ABCs are codified in California Code of Civil Procedure § 1800, *et seq*. and

7

§ 493.010, *et seq.  See also Pobreslo v. Joseph M. Boyd Co.,* 287 U.S. 518, 524-26 (1933) (recognizing and upholding an assignment for the benefit of creditors); *Sherwood Partners, Inc. vs. Lycos, Inc.,* 394 F.3d 1198, 1205 n.8 (9th Cir. 2005) (noting that ABCs have a "venerable common-law pedigree"); *Haberbush v. Cummins*, 139 Cal. App. 4th 1630 1637-40 (2006) (finding that California Code of Civil Procedure Section 1800 is not preempted by the Bankruptcy Code). Section 493.020 provides that, "[n]otwithstanding any other provision of this title, the defendant may make a general assignment for the benefit of creditors."  Cal. Code Civ. P. § 493.020.  The Law Revision Commission Comment to this section provides that "Section 493.020 and the remainder of Chapter 13 reflect the policy favoring general assignments for the benefit of creditors (which contemplate the ratable distribution to creditors of the assignor's assets) over attachment (which permits an unsecured creditor to establish priority of other unsecured claims." )."  Cal. Law Revision Comm'n Comment, Cal. Code Civ. P. § 493.020.

Similar to a Chapter 7 bankruptcy case, an ABC allows for the orderly liquidation of a company's assets.  An assignee has similar powers as a Chapter 7 trustee, including, without limitation, the ability to monetize the assignor's assets and avoid and recover preferential transfers and fraudulent transfers on behalf of the estate's creditors.  *See* Cal. Code Civ. P. § 1800; Cal. Civ. Code § 3439 *et seq.* (California Uniform Fraudulent Transfer Act).

Given that an ABC is a well-respected and efficient process for liquidating a company's assets (as well as the similarities between an ABC and a Chapter 7 bankruptcy case), it is not surprising that "courts generally dismiss an involuntary case under § 305(a)(1) where the debtor has made an assignment for the benefit of creditors."  *In re Cincinnati Gear Co.*, 304 B.R. at 785 (citing, among others, Mike C. Buckley & Gregory Sterling, What Banks Need to Know About ABCs, 120 Banking L.J. 48, 54 (2003) ("Reluctant creditors will find it difficult to attack an ABC. . . . Replacing one professional fiduciary with another would generally be a waste of resources and time, and most such involuntary bankruptcies are dismissed, or the bankruptcy court abstains in deference to the existing ABC.")); *see also In re Bailey's Beauticians Supply Co.*, 671 F.2d 1063, 1067 (7th Cir. 1982) (affirming the dismissal of an involuntary petition filed after an assignment for the benefit

8

of creditors);[10] *Macke Int'l Trade*, 370 B.R. at 247 (noting that "[t]ypical circumstances for dismissing under § 305(a)(1) include the pendency of proceedings such as assignments for the benefit of creditors" and affirming order dismissing involuntary bankruptcy case commenced after an ABC); *In re NNN Realty Advisors, Inc.*, No. 15-30508-BKC-RBR, 2016 Bankr. LEXIS 1777, at *7-9 (Bankr. S.D. Fla. Apr. 15, 2016) (dismissing an involuntary petition filed several weeks after an ABC); *In re Short Hills Caterers, Inc.*, No. 08-18604 (DHS), 2008 Bankr. LEXIS 1726, at *16 (Bankr. D.N.J. June 4, 2008) (granting motion to dismiss an involuntary petition filed after an ABC);[11] *In re Mineral Hill Corp.*, 16 B.R. 687, 688 (Bankr. D. Md. 1982) ("Dismissal or suspension would ordinarily be warranted under [Section 305] if another forum is available to protect the interests of both parties or there is already a pending proceeding in a state court (e.g., assignment for benefit of creditors)."); *In re M. Egan Co.*, 24 B.R. 189, 191 (Bankr. W.D.N.Y. 1982) (noting that "[t]he pending proceedings which have been sufficient to invoke different courts abstention [include] . . . assignments for the benefit of creditors" and granting motion to dismiss when an involuntary

---

[10]     The Seventh Circuit held that:

> There is ample evidence to support the bankruptcy judge's determination that the creditors as a whole would profit from [the assignee's] continued administration of the estate. [The assignee] did a more than competent job. He reduced the secured debt by thirty percent. He arranged a financially successful sale of assets. The compromise with Century would appear to benefit all of the creditors. [The assignee's] administration of the estate was more than satisfactory to those creditors who together held over ninety percent of the claims against [the assignor]. **If the petition were to proceed, the majority of work entrusted to the trustee would constitute a duplication of that already completed by [the assignee]. The record lacks evidence of how the petitioning creditors, or the creditors as a whole, are at all prejudiced by the proceedings under [the assignee].** Further, we read [the district court judge's] opinion as sharing the bankruptcy judge's conclusion that the creditors would actually benefit from the dismissal of the petition.

*Id.* (emphasis added).

[11]     In so holding, the court noted that:

> [T]he Assignee is a well-known and experienced professional in ABC as well as bankruptcy cases. To date, he has taken the proper measures to secure the premises and marshal the assets. At this juncture, the Assignee believes there will be a 100% recovery for all creditors; thus, there is no benefit to be gained for creditors from a bankruptcy court proceeding under the Bankruptcy Code. . . . Lastly, judicial economy and efficiency warrant the continuation of the ABC proceeding with . . . the Assignee.

*Id.* at *16.

9

bankruptcy case was commenced following an ABC).

Courts have reasoned that "there is no need to invoke the machinery of the bankruptcy process if there is an alternative means of achieving the equitable distribution of assets." *In re Michael S. Starbuck, Inc.*, 14 B.R. 134, 135 (Bankr. S.D.N.Y. 1981); *see also In re NNN Realty Advisors, Inc.*, 2016 Bankr. LEXIS 1777, at *8-9 ("[F]ederal bankruptcy jurisdiction is not necessary to reach a just and equitable solution . . . when the [pending ABC] presents an administratively efficient alternative that is already underway."); *In re 801 South Wells St. Ltd. P'ship*, 192 B.R. 718, 724 (Bankr. N.D. Ill. 1996) ("In determining whether abstention is in the best interests of the debtor and all creditors, courts have considered whether another forum is available to protect the interest of [the] parties or there is already a pending proceeding in state court. A suitable alternative forum will be deemed to exist if in that forum there are pending arrangements that will equitably satisfy the creditors and not be unduly burdensome or prejudicial to the debtor, so that continuation of the bankruptcy proceeding will be duplicitous and uneconomical.") (quotations omitted); *In re Runaway II, Inc.*, 168 B.R. 193, 198 (Bankr. W.D. Mo. 1994) (dismissing involuntary petition because "[a]bsent the bankruptcy, the estate would be in the hands of the Receiver who is charged with its preservation for the benefit of the creditors [and] [t]hus, the creditors would not be harmed by the resolution of this dispute in [the non-bankruptcy forum]"); *In re Williamsburg Suites, Ltd.*, 117 B.R. 216, 220 (Bankr. E.D. Va. 1990) (dismissing an involuntary petition under Section 305(a) when the petition was filed after commencement of a state court receivership and state law afforded a more economical and efficient method for dissolving the entity and liquidating its assets).

In addition, "bankruptcy courts generally grant motions to abstain in two-party disputes where the petitioner can obtain adequate relief in a non-bankruptcy forum." *In re AXL Indus., Inc.*, 127 B.R. 482, 484 (S.D. Fla. 1991); *see also Efron v. Candelario (In re Efron)*, 529 B.R. 396, 406 (B.A.P. 1st Cir. 2015) ("A significant factor in favor of dismissing a case pursuant to § 305(a)(1) is the absence of a true bankruptcy purpose, particularly where the bankruptcy case constitutes a two-party dispute between the debtor and a single creditor."); *Macke Int'l Trade*, 370 B.R. at 243 (affirming bankruptcy court's order dismissing involuntary bankruptcy case after an ABC and noting that "[t]his is a two-party dispute between [the alleged debtor] and a single creditor with a long

10

history of litigation"); *Lucre Mgmt. Grp., LLC v. Schempp Real Estate, LLC (In re Schempp Real Estate, LLC)*, 303 B.R. 866, 877 (Bankr. D. Colo. 2003) (finding, in connection with its decision to abstain, that "[t]his bankruptcy appears to be nothing more than an effort to enlist the resources of the bankruptcy court as yet another litigation tactic in a two-party dispute"); *In re Westerleigh Dev. Corp.*, 141 B.R. 38, 40 (Bankr. S.D.N.Y. 1992) ("[A] bankruptcy court should not entertain a two-party dispute unless special circumstances exist, such as fraud, artifice or scam."); Collier on Bankruptcy ¶ 305.02 (Richard Levin & Henry J. Sommer eds., 16th ed.) ("Dismissal or suspension of a case may be appropriate when the bankruptcy case constitutes a two-party dispute between the debtor and a single creditor.").

As described above, on September 26, 2018, Len Co executed the Assignment Agreement, thereby assigning its assets to the Assignee, who will administer Len Co's assets in order to maximize their value.  The administration of Len Co's assets by a third-party fiduciary under a well-established process pursuant to California law renders the continuation of this bankruptcy case "duplicitous and uneconomical."  *See In re 801 South Wells St. Ltd. P'ship*, 192 B.R. at 724.  Indeed, as set forth in the immediately subsequent section, the Assignment will be significantly less expensive than a Chapter 7 process, while the latter would not provide any additional discernable benefit to Len Co or its stakeholders.  Given the pending Assignment and the fact that this matter is one of several components of a broader two-party dispute between Ms. Machulskaya and Mr. Perelman, the Movants submit that the Court should abstain under Bankruptcy Code Section 305(a)(1).

### 1.    Relative Costs of the Assignment and a Chapter 7 Proceeding

Not only would a Chapter 7 proceeding provide no discernable benefit to Len Co's stakeholders given the pending Assignment, but the significantly higher fees and incremental administrative expenses that would be incurred in connection with such a proceeding would far exceed the fees and expenses incurred in connection with the Assignment, thereby materially and unnecessarily depleting the proceeds available for distribution to Len Co's stakeholders.  As set forth in the chart below,[12] in a scenario in which the three promissory notes evidencing the obligations of

---

[12]    The chart is for illustrative purposes only.

11

Knight Capital under the Knight Credit Facility (the "<u>Knight Notes</u>") and the Knight Class A Units generate between $35 million to $55 million in proceeds for the estate, the fees payable to the Chapter 7 trustee under Bankruptcy Code Section 326(a) would exceed the fees payable to the Assignee under the Assignment Agreement by approximately $1.05 million to $1.35 million.

| Payments to Len Co Estate[13] | Fees Payable to Chapter 7 Trustee | Fees Payable to Assignee[14] | Incremental Cost to Len Co Estate |
|---|---|---|---|
| $35 million | $1,073,250 | $20,000 | $1,053,250 |
| $40 million | $1,223,250 | $20,000 | $1,203,250 |
| $45 million | $1,373,250 | $20,000 | $1,353,250 |
| $50 million | $1,458,509 | $125,402 | $1,333,107 |
| $55 million | $1,458,509 | $375,402 | $1,083,107 |

Moreover, any such fees payable to a Chapter 7 trustee do not take into account the additional administrative expenses that would be incurred by the trustee's professionals, including, without limitation, its attorneys, accountants, and financial advisors, who would likely incur considerable incremental fees gathering information and analyzing Len Co's assets and the method by which to maximize their value. In contrast, the Movants, their respective counsel, and the financial advisor retained by the Assignee have a significant amount of institutional knowledge and have already made substantial progress in conducting a comprehensive investigation and financial analysis of Len Co and its assets. Thus, the costs associated with a duplicative investigation and analysis would be avoided if the Involuntary Petition were dismissed and the Assignment permitted to proceed.

Given the materially higher costs associated with the continuation of this Chapter 7 proceeding and, as set forth more fully below, the absence of a discernable benefit to allowing the Chapter 7 case to proceed, the Movants respectfully submit that this case should be dismissed to

---

[13]     The calculations in the final two rows contemplate $1 million of administrative expenses.

[14]     The Assignee is entitled to a $15,000 annual fee and a one-time $5,000 fee payable on or after January 1, 2019. *See* Assignment Agreement, § 5.0. Solely for purposes of this chart, we have assumed a payment of a single $15,000 annual fee plus the $5,000 fee payable on or after January 1, 2019. In addition, in the event that surplus proceeds are available to be paid to the holders of Len Co's units, the Assignee is entitled to (i) a $50,000 fee and (ii) five percent (5%) of such surplus proceeds. *See id.*

12

allow the pending Assignment to proceed expeditiously.  *See In re NNN Realty Advisors, Inc.*, 2016 Bankr. LEXIS 1777, at *8 ("The [pending ABC] provides a less expensive arrangement for [the alleged debtor] to equitably liquidate its assets in a manner that serves all interested parties in this case. If Petitioning Creditors earnestly seek an expeditious, structured wind down and liquidation of [the alleged debtor's] assets and participation in the distribution of those assets, then the [pending ABC] satisfies that need and protects their interests."); *see also Macke Int'l Trade*, 370 B.R. at 247 (dismissing an involuntary bankruptcy case and citing the bankruptcy court's finding that "the continuation of this case would only lead to administrative expenses and would be a waste of judicial resources"); *In re Spade*, 258 B.R. 221, 236 (Bankr. D. Colo. 2001) ("Bringing this case into the bankruptcy court would only add an additional layer of expense to the resolution of this two-party case. Assuming the case remains in Chapter 7, the estate will be required to pay the fees and costs of any specialized bankruptcy counsel hired by the trustee as well as the trustee's compensation for the administration of the estate. Additionally, the bankruptcy court will be required to carry out all of the administrative obligations that are inherent in Chapter 7 liquidation proceedings. Given . . . that the state court affords creditors a suitable forum to resolve this dispute, it would be inefficient and excessively costly to process this debt collection case through this Court."); *In re M. Egan Co.*, 24 B.R. 189, 191 (Bankr. W.D.N.Y. 1982) ("The Courts have placed great emphasis in invoking 11 U.S.C. § 305(a) on the economy of administration of a case, the need for additional administrative expenses, and the duplication of effort."); *In re Artists' Outlet, Inc.*, 25 B.R. 231, 233 (Bankr. D. Mass. 1982) (noting that "were the bankruptcy court to retain jurisdiction over this case, the administrative expenses necessarily incurred in a case under Chapter 7 would deplete the already minimal assets of the estate").

## V.     THE INVOLUNTARY PETITION SHOULD BE DISMISSED UNDER BANKRUPTCY CODE SECTIONS 105(A) AND 303 BECAUSE IT WAS FILED BY STM IN BAD FAITH

Courts have recognized their authority to dismiss an involuntary petition that is commenced by petitioning creditors in bad faith.  *See In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015) (holding that an involuntary petition filed under Section 303 may be dismissed

13

for bad faith, regardless of whether the other requirements of commencing an action under Section 303 are met); *In re United States Optical, Inc.*, No. 92-1496, 1993 U.S. App. LEXIS 6960, at *9 (4th Cir. Apr. 1, 1993) ("Courts are duty bound to conduct an inquiry, if requested, to determine whether an involuntary petition has been filed in good faith. Bad faith filings are to be dismissed.") (citations omitted); *In re WLB-RSK Venture*, 296 B.R. 509, 513 (Bankr. C.D. Cal. 2003) (dismissing an "involuntary petition pursuant to [the court's] powers under § 105(a) in conjunction with the Congressional intent as expressed in § 303(i)(2)"); *see also Prometheus Health Imaging, Inc. v. UST - United States Tr. (In re Prometheus Health Imaging, Inc.)*, 705 F. App'x 626, 627 (9th Cir. 2017) ("Under 11 U.S.C. § 1112(b)(1), a court may dismiss a Chapter 11 bankruptcy case 'for cause,' based on a finding the petition was filed in bad faith.").[15]

Dismissal in such circumstances flows from the precept that the federal bankruptcy process should only be utilized in good faith and to advance Congress' intended purposes, which renders it unavailable to those with unclean hands. *See, e.g., In re Bicoastal Holding Co.*, 402 B.R. 916, 919 (Bankr. M.D. Fla. 2009) ("The principles applicable to a bad faith involuntary filing have been considered by courts in the past. It has been generally concluded that the petition must be filed in good faith, and the petitioner must come to the courts with clean hands."); *Middel v. Jake's on the Pike (In re Jake's on the Pike)*, 78 B.R. 461, 463 (Bankr. E.D. Va. 1987) ("The familiar maxim that 'he who comes into equity must come with clean hands' means that a litigant cannot call upon a court of equity to grant him extraordinary relief if he himself has been guilty of inequitable or unconscionable conduct. The 'unclean hands' doctrine has been applied to deny petitioning creditors

---

[15]    In *In re Marciano*, the Bankruptcy Appellate Panel for the Ninth Circuit found that the bankruptcy court did not abuse its discretion in limiting discovery regarding the petitioning creditors' alleged bad faith, which the alleged debtor had raised as an affirmative defense in his answer to the involuntary petition. *See Marciano v. Fahs (In re Marciano)*, 459 B.R. 27, 40-45 (B.A.P. 9th Cir. 2011). Although the Ninth Circuit affirmed the Bankruptcy Appellate Panel's decision, it only briefly discussed and did not directly address the bad faith issue. *See Marciano v. Chapnick (In re Marciano)*, 708 F.3d 1123, 1129 (9th Cir. 2013) ("The Bankruptcy Code does not expressly provide for dismissal of an otherwise proper involuntary petition because of the subjective 'bad faith' of the filers. But even assuming the theoretical availability of such a defense, we cannot perceive the benefit of discovery on the issue here[.]"); *see also* Collier on Bankruptcy ¶ 303.16[1] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("Of the two points of view expressed in the appellate panel decision, and given the *non sequitur* that concluded the circuit court's brief discussion of this issue, Judge Markell's dissent is much more in line with bankruptcy theory and precedent than is the opinion of the majority. Judge Markell's position was vindicated in *In re Forever Green Athletic Fields, Inc.*") (citing *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2016)).

Case: 18-52484    Doc# 6    Filed: 11/27/18    Entered: 11/27/18 21:36:29    Page 21 of 26
US-DOCS\104233087.1

relief in the Bankruptcy Courts.") (citations omitted).

Courts in the Ninth Circuit rely upon a fact-specific, "objective" test for a bad faith involuntary filing, which examines whether a reasonable person would resort to the bankruptcy process under similar circumstances. *See, e.g., Jaffe v. Wavelength, Inc. (In re Wavelength, Inc.),* 61 B.R. 614, 620 (B.A.P. 9th Cir. 1986); *In re Mi La Sul,* 380 B.R. 546, 557 (Bankr. C.D. Cal. 2007). This test does not ignore the petitioning creditors' actual motivations, however, as such motivations may be tellingly juxtaposed with how a reasonable person would have acted. *See, e.g., In re Grecian Heights Owners' Ass'n,* 27 B.R. 172, 174 (Bankr. D. Or. 1982) (cited and followed in *Wavelength*, 61 B.R. at 620). Since courts often lack directly incriminating evidence, "it is the more usual situation that courts must surmise the petitioning creditor's intent based upon the circumstances of the case." *In re Caucus Distribs., Inc.,* 106 B.R. 890, 926 (Bankr. E.D. Va. 1989).

Courts often evaluate petitioning creditors' good faith under the "totality of the circumstances" standard, which includes a host of factors that courts consider in determining whether an involuntary petition was filed in bad faith, including whether:

> [T]he creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or a dissipation of the debtor's assets; **the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions;** the filing was used as a substitute for customary debt collection procedures; and the filing had suspicious timing.

*Forever Green,* 804 F.3d at 336 (emphasis added).

Bad faith is typically found to exist where, as here, the petitioners file the involuntary petition for an improper purpose seeking to gain an undue tactical advantage. *See id.* at 335 (dismissing involuntary bankruptcy case and imposing sanctions where involuntary was used as litigation strategy to pursue individual interests that "ran counter to the spirit of collective creditor action which should animate an involuntary filing"); *Mi La Sul,* 380 B.R. at 557 (finding bad faith where the petitioners used the involuntary process to obtain a disproportionate advantage over other

15

creditors); *In re Grossinger*, 268 B.R. 386, 389 (Bankr. S.D.N.Y. 2001) (setting forth that an improper use of the Bankruptcy Code justifying a finding of bad faith exists any time a creditor uses an involuntary bankruptcy to obtain a disproportionate advantage to that particular creditor's position, rather than to protect against other creditors obtaining such a disproportionate advantage). In this regard, bankruptcy courts routinely dismiss involuntary cases commenced as a litigation tactic to gain an advantage in litigation or to control the forum of the dispute. *See WLB-RSK Venture*, 296 B.R. at 514 (dismissing involuntary petition filed "as part of a forum shopping litigation tactic"); *Spade*, 269 B.R. at 229 (dismissing involuntary petition filed as a self-serving litigation tactic to control the forum); *see also In re Silberkraus*, 253 B.R. 890, 905 (Bankr. C.D. Cal. 2000), *aff'd*, 336 F.3d 864 (9th Cir. 2003) ("[I]t constitutes bad faith to file bankruptcy to impede, delay, forum shop, **or obtain a tactical advantage regarding litigation ongoing in nonbankruptcy forum**[.]") (emphasis added).

Given that STM knew of the Assignment,[16] its filing of the Involuntary Petition against Len Co smacks of litigation tactics and forum shopping by a party seeking to gain leverage in the context of a broader dispute. A reasonable creditor in STM's position would not have commenced this case under these circumstances given that, among other things, (i) the Assignment Agreement had been executed, (ii) the Chapter 7 proceeding comes with significantly greater attendant costs than does the Assignment, and (iii) a Chapter 7 trustee would be in no better position to liquidate the Knight Notes and the Knight Class A Units than the Assignee. The bankruptcy filing serves no legitimate purpose and, in fact, will likely harm stakeholders by needlessly increasing costs and depleting the funds available for such stakeholders. Given that STM is Len Co's largest creditor by a significant margin, its willingness to subject itself to a significantly more expensive process suggests that the filing of the Involuntary Petition was nothing more than a litigation tactic designed to exert pressure in the AMV Dispute, rather than an attempt to seek the best forum for the administration and liquidation of Len Co's assets.

---

[16]    Counsel to STM was notified of the Assignment on or about September 27, 2018, and the Assignee delivered a formal notice of the Assignment to STM on or about October 24, 2018.

## VI. THE MOVANTS ARE ENTITLED TO ATTORNEYS' FEES, COSTS, AND DAMAGES

Under Bankruptcy Code Section 303(i), there is a presumption that costs and attorney's fees will be awarded to a putative debtor where an involuntary petition is dismissed. *See In re Express Car Truck & Rental, Inc.,* 440 B.R. 422, 431-32 (Bankr. E.D. Pa. 2010). A petitioner bears the burden of proof on justifying a denial of costs and fees. Section 303(i) provides:

> If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment (1) against the petitioners and in favor of the debtor for (A) costs; or (B) a reasonable attorney's fee; or (2) against any petitioner that filed the petition in bad faith, for (A) damages proximately caused by such filing; or (B) punitive damages.

11 U.S.C. § 303(i).

The Ninth Circuit has made clear that, if an involuntary petition is dismissed (for bad faith or otherwise), the petitioners should routinely expect to pay the legal expenses arising from the involuntary filing. *See Higgins v. Vortex Fishing Systems, Inc.,* 379 F.3d 701, 707 (9th Cir. 2004); *see also Macke Int'l Trade,* 370 B.R. at 249. Additionally, if the court finds that the involuntary petition was filed in "bad faith" by a petitioning creditor, the court may impose damages, including punitive damages and/or sanctions, against the offending petitioning creditors. *See* 11 U.S.C. § 303(i)(2); *Forever Green,* 804 F.3d at 334; *In re Meltzer,* 516 B.R. 504, 514 (Bankr. N.D. Ill. 2014) ("Although the statute uses the disjunctive 'or' . . . , the statutory remedies are not mutually exclusive."); *see also* Collier on Bankruptcy ¶ 303.33 (Richard Levin & Henry J. Sommer eds., 16th ed.) ("The determination of bad faith for purposes of section 303(i) is the same as determining bad faith more generally under section 303."). Punitive damages may be awarded for bad faith filings even if no actual damages are proven (unlike the rule in punitive damage cases generally). *See, e.g., In re Southern Calif. Sunbelt Developers, Inc.,* 608 F.3d 456, 465 (9th Cir. 2010); *Macke Int'l Trade,* 370 B.R. at 256 ("In the Ninth Circuit, the bankruptcy court can allow punitive damages without having to award compensatory or actual damages, or in addition to those damages.") (citing *In re Wavelength, Inc.,* 61 B.R. at 621).

As discussed above, the Involuntary Petition was filed without a proper purpose and in bad faith. Despite having knowledge of the pending Assignment, STM filed the Involuntary Petition in an attempt to exert pressure over Mr. Perelman in the AMV Dispute. STM's transparent attempt to use the bankruptcy system to obtain an undue advantage is precisely the type of meritless involuntary filing that Bankruptcy Code Section 303(i) was designed to prevent. Thus, the Movants respectfully request that the Court enter judgment against STM and in favor of Len Co and the Assignee for reasonable attorneys' fees, costs, and damages (including punitive damages), subject to proof upon dismissal of the case.

## VII. IF THE INVOLUNTARY PETITION IS NOT IMMEDIATELY DISMISSED, STM SHOULD BE REQUIRED TO POST A BOND

In the alternative, if the Court does not immediately dismiss the Involuntary Petition, STM should be required to post a bond pursuant to Bankruptcy Code Section 303(e). Bankruptcy Code Section 303(e) provides: "After notice and a hearing, and for cause, the court may require the petitioners under this section to file a bond to indemnify the debtor for such amounts as the court may later allow under subsection (i) of this section." 11 U.S.C. § 303(e). Because this case was filed in bad faith, the Movants respectfully submit that STM will be liable for attorneys' fees and costs, plus additional damages, pursuant to Bankruptcy Code Section 303(i). The Movants therefore request a bond in the amount of $500,000 to indemnify the Movants for such amounts as the Court may impose against STM.

## VIII. CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court immediately dismiss the Involuntary Petition and award each of the Movants their respective attorneys' fees, costs, and damages (including punitive damages), subject to proof. Alternatively, Movants respectfully request that, if the Court does not immediately dismiss the Involuntary Petition, then STM be required to post a bond of not less than $500,000.

18

| | |
|---|---|
| 1 | DATED: November 27, 2018 |
| 2 | |

DATED: November 27, 2018        BRUTZKUS GUBNER

By: _____
     David Seror
     Jessica L. Bagdanov
     Attorneys for ABC Services Group, Inc.,
     Assignee for the Benefit of Creditors of
     Len Co, LLC, Alleged Debtor

DATED: November 27, 2018        LATHAM & WATKINS LLP

By: /s/ Helena G. Tseregounis
     Jeffrey E. Bjork
     Adam E. Malatesta
     Helena G. Tseregounis
     Attorneys for Len Co, LLC, Alleged Debtor